**AFFIDAVIT OF SPECIAL AGENT JEREMY D. BRISSON IN SUPPORT OF
AN APPLICATION FOR CRIMINAL COMPLAINTS**

I, Jeremy D. Brisson, hereby state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I have been employed as an ATF Special Agent since 2023.  As an ATF Special Agent, my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, and the use of firearms in drug trafficking crimes.  I was the distinguished honor graduate of the ATF National Academy and of the Federal Law Enforcement Training Center.  During my tenure with ATF, I have received training in investigations involving federal firearms, explosives, arson, and narcotics violations.  These violations include but are not limited to the unlawful possession of firearms by prohibited individuals, straw purchasing (which is the illegal purchasing of a firearm on the behalf of another individual), firearms trafficking, and the use of firearms in furtherance of criminal acts such as the distribution of controlled substances.  Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, to include their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply.  I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.  Based on my training and experience as a Special Agent, I am familiar with federal narcotics laws.  I know that it is a violation of Title 21 U.S.C. §§ 841(a)(1) and 846, for any person to conspire to, or to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

2. I am currently assigned to Group VI in the Boston Field Division of the ATF. This group works with other federal, state, and local police departments north of the City of Boston to investigate and prosecute violations of federal firearms, explosives, and controlled substance laws. Prior to my employment with ATF, I was employed as a Deputy United States Marshal with the United States Marshal Service, a Federal Air Marshal with the U.S. Department of Homeland Security, and as a municipal law enforcement officer in the state of New Hampshire.

3. Since August 2024, ATF has been investigating a ring of illegal firearms and narcotics distribution, involving Pablo Baez Sanchez ("BAEZ SANCHEZ"), Waren Tejada Lara ("TEJADA LARA"), Wilfry Sanchez Paredes ("SANCHEZ PAREDES"), Eddy Pena ("PENA"), ███████████████████ and Justin Merett Martinez ("MARTINEZ") (collectively, the "Target Subjects")

4. I submit this affidavit in support of applications for criminal complaints charging:

    a. BAEZ SANCHEZ, TEJADA LARA, and SANCHEZ PAREDES with conspiracy to distribute and to possess with intent to distribute in excess of 40 grams of fentanyl , in violation of 21 U.S.C. §§ 841(a) and (b)(1)(B)(vi) and 846;

    b. BAEZ SANCHEZ, TEJADA LARA, SANCHEZ PAREDES, PENA, and ███████ with conspiracy to engage in the business of dealing firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A) beginning in February 2025 and continuing to in or about May 2026; and

    c. PENA and MARTINEZ with conspiracy to engage in the business of dealing firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A) beginning in or about March 2, 2026 and continuing to at least March 11, 2026.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6.      In August of 2024, ATF initiated a criminal investigation upon receipt of information from a confidential informant ("CI-1") stating that BAEZ SANCHEZ was engaged in the illegal distribution of controlled substances and firearms in the area of Lawrence, Massachusetts.  CI-1 has provided information that has been verified by investigators throughout the course of the investigation, including through audio and video recordings of controlled purchases, as discussed in more detail below.

7.      In November 2024, at the direction of investigators, CI-1 introduced another confidential informant (CI-2) to BAEZ SANCHEZ as a purchaser of firearms.

8.      Between August 20, 2024 and May 4, 2026, investigators conducted 17 controlled purchases of fentanyl and firearms involving the Target Subjects.

9.      Each of the controlled purchases described in further detail below were audio and video recorded and were conducted while the confidential informants ("CIs") were under surveillance of investigators.  In addition, the CIs were searched prior to and following each purchase for any contraband and/or unaccounted money.  No contraband or unaccounted money were found on the CIs in any of the searches conducted in connection with these controlled purchases.  Finally, each of the controlled purchases were completed utilizing an ATF undercover

3

vehicle equipped with audio and video recording equipment and pre-recorded United States currency.

10.    Below is a chart summarizing the controlled purchases in which the Target Subjects have sold approximately 1,860 grams of fentanyl and 25 firearms:

| Buy# | Buy Date | Defendants Involved in Transaction | Fentanyl Sold (approximate amount) | # Firearms Sold | Paragraphs in Affidavit |
|---|---|---|---|---|---|
| 1 | 8/20/2024 | BAEZ SANCHEZ | 200 grams | | 11-16 |
| 2 | 8/28/2024 | BAEZ SANCHEZ | 300 grams | | 17-21 |
| 3 | 9/16/2024 | BAEZ SANCHEZ | 300 grams | | 22-26 |
| 4 | 11/15/2024 | BAEZ SANCHEZ | | 1 | 27-32 |
| 5 | 1/8/2025 | BAEZ SANCHEZ | 300 grams | 2 | 33-44 |
| 6 | 1/27/2025 | BAEZ SANCHEZ | 150 grams | 2 | 45-52 |
| 7 | 2/10/2025 | BAEZ SANCHEZ; TEJADA LARA | | 2 | 53-57 |
| 8 | 5/23/2025 | BAEZ SANCHEZ | 100 grams | 2 | 58-68 |
| 9 | 11/26/2025 | BAEZ SANCHEZ; SANCHEZ PAREDES; TEJADA LARA | 200 grams | | 69-75 |
| 10 | 12/3/2025 | BAEZ SANCHEZ; SANCHEZ PAREDES; PENA | | 2 | 76-83 |
| 11 | 12/16/2025 | BAEZ SANCHEZ; ▮▮▮▮ | | 2 | 84-91 |
| 12 | 1/22/2026 | BAEZ SANCHEZ; SANCHEZ PAREDES | | 2 | 92-101 |
| 13 | 2/20/2026 | BAEZ SANCHEZ; PENA; ▮▮▮▮ | | 2 | 102-110 |
| 14 | 3/4/2026 | PENA; MARTINEZ | | 1 | 111-117 |
| 15 | 3/11/2026 | PENA; MARTINEZ | | 3 | 118-124 |
| 16 | 3/19/2026 | PENA | 10 grams | 2 | 125-132 |
| 17 | 5/4/2026 | BAEZ SANCHEZ; TEJADA LARA; PAREDES SANCHEZ | 300 grams | 2 | 135-142 |

**August 20, 2024 Controlled Purchase of Fentanyl**

11.     Between August 19 and 20, 2024, BAEZ SANCHEZ communicated with CI-1 regarding the purchase of fentanyl.  BAEZ SANCHEZ directed CI-1 to meet at in Haverhill, Massachusetts, to purchase fentanyl.

12.     On August 20, 2024, investigators set up surveillance in the agreed-upon location in Haverhill.  Shortley after CI-1 arrived at the agreed-upon location, investigators observed a silver Audi A4 registered to TEJADA LARA.

13.     Investigators saw BAEZ SANCHEZ (who they recognized from his picture on file with the Massachusetts RMV and a picture taken from a previous interaction with CI-1 that investigators surveilled) enter the ATF undercover vehicle around seven minutes after CI-1 arrived.  Investigators saw BAEZ SANCHEZ exit the ATF undercover vehicle after about three minutes.  Investigators then saw BAEZ SANCHEZ walk approximately one block and enter TEJADA LARA's silver Audi A4.

14.     CI-1 met with investigators following the transaction and provided investigators with the suspected fentanyl purchased from BAEZ SANCHEZ.  The substance was tested at the Department of Homeland Security U.S. Customs and Border Protection Laboratories and Scientific Services in Chicago (the "CBP Laboratory").  The CBP Laboratory determined that the substance was approximately 210.54 grams of a substance containing fentanyl.

**August 28, 2024 Controlled Purchase of Fentanyl**

15.     Between August 26, 2024 and August 28, 2024, BAEZ SANCHEZ communicated with CI-1 regarding the purchase of fentanyl and one firearm.  BAEZ SANCHEZ directed CI-1 to meet in Haverhill again.

16.     On August 28, 2024, investigators set up surveillance in the area of the agreed-upon meeting location in Haverhill.  CI-1 arrived to the agreed-upon location.  BAEZ SANCHEZ had already arrived.  BAEZ SANCHEZ walked to the ATF undercover vehicle as CI-1 arrived and then exited about two minutes later.

17.     CI-1 met with investigators following the transaction and provided investigators with the suspected fentanyl.  As captured on video inside the ATF undercover vehicle, BAEZ SANCHEZ handed CI-1 a Wendy's fast-food bag with suspected fentanyl inside.  BAEZ SANCHEZ then told CI-1 that he was unable to get a firearm as BAEZ SANCHEZ's associate that deals with firearms had been arrested and so they were being cautious.  CI-1 handed BAEZ SANCHEZ the money in exchange for the fentanyl, which BAEZ SANCHEZ put in his sock before exiting the ATF undercover vehicle.

18.     The CBP Laboratory determined that the substance was approximately 311.12 grams of a substance containing fentanyl.

**September 16, 2024 Controlled Purchase of Fentanyl**

19.     Between September 12, 2024 and September 16, 2024, BAEZ SANCHEZ communicated with CI-1 regarding the purchase of more fentanyl.  BAEZ SANCHEZ instructed CI-1 to meet in Methuen, Massachusetts.

20.     On September 26, 2024, investigators set up surveillance in the area of the agreed-upon location in Methuen.  Upon CI-1's arrival at the agreed-upon location, investigators observed BAEZ SANCHEZ exit a 2008 Volkswagen GTI, then approach the ATF undercover vehicle and enter it.  About one minute later, investigators saw the ATF undercover vehicle drive away from the initial location and then pull over at another parking lot about one quarter of a mile away.

About two minutes after arriving at the next location, investigators saw BAEZ SANCHEZ exit the ATF undercover vehicle at the parking lot.

21.    CI-1 met with investigators and provided investigators with the suspected fentanyl. CI-1 reported that BAEZ SANCHEZ entered the ATF undercover vehicle and told CI-1 he was suspicious of two vehicles in the parking lot.  BAEZ SANCHEZ directed CI-1 to drive further down the parking lot and handed CI-1 the container with the suspected fentanyl.  CI-1 then gave BAEZ SANCHEZ the money.  BAEZ SANCHEZ then told CI-1 he would have a firearm for CI-1 to purchase with more fentanyl.  The video captured from the ATF undercover vehicle is consistent with CI-1's description of the transaction.

22.    The CBP Laboratory determined that the substance was approximately 310.78 grams of a substance containing fentanyl.

**November 15, 2024 Controlled Purchase of 9MM Pistol**

23.    Between November 14, 2024 and November 15, 2024, BAEZ SANCHEZ communicated with CI-1 regarding the purchase of a firearm.   In these communications, BAEZ SANCHEZ stated that he did not like selling guns because the profit is not as good as it is selling drugs.  BAEZ SANCHEZ also said that he had two guns to sell but one of the guns was with someone else.  BAEZ SANCHEZ directed CI-1 to meet in Haverhill to conduct the transaction.

24.    On November 15, 2024, investigators set up surveillance at the agreed-upon meeting location in Haverhill.  Upon arriving, CI-1 called BAEZ SANCHEZ.  Investigators then saw BAEZ SANCHEZ exit a 2022 Honda Civic and walk to the ATF undercover vehicle.  BAEZ SANCHEZ exited after about two minutes.

25.     CI-1 met with investigators and provided investigators the firearm and magazine purchased from BAEZ SANCHEZ.  The firearm was a Taurus Millennium G2 9mm pistol bearing serial number TJR65263.

26.     CI-1 told investigators that BAEZ SANCHEZ appeared paranoid upon entering the ATF undercover vehicle and even touched CI-1's chest looking for a wire.  CI-1 stated that BAEZ SANCHEZ handed CI-1 a container of protein powder and CI-1 asked BAEZ SANCHEZ to open the container to show the contents inside.  After BAEZ SANCHEZ showed the contents of the container, CI-1 pulled a plastic bag out of the protein powder container which contained the Taurus Millennium G2 9mm pistol and two magazines.  The video captured in the ATF undercover vehicle confirms this description from CI-1.

27.     BAEZ SANCHEZ also told CI-1 that he would like to sell CI-1 more fentanyl and another firearm.

**January 8, 2025 Controlled Purchase of Fentanyl and Two Firearms**

28.     Subsequent to the November 15, 2024 controlled purchase, at the direction of investigators, CI-1 introduced another confidential informant, CI-2, to BAEZ SANCHEZ. Investigators attempted to introduce CI-2 as the person for whom CI-1 was purchasing firearms. And, as BAEZ SANCHEZ represented in prior transactions that he did not like to sell firearms, investigators instructed CI-2 to attempt to have BAEZ SANCHEZ introduce CI-2 to BAEZ SANCHEZ's source for firearms.

29.     Between January 6, 2025 and January 8, 2025, BAEZ SANCHEZ communicated with the CIs regarding the purchase of firearms and fentanyl.   BAEZ SANCHEZ directed the CIs to meet in Methuen, Massachusetts to conduct the transaction.

30.     On January 8, 2025, investigators set up surveillance at the agreed-upon meeting location in Methuen.  At the direction of investigators, the CIs drove the ATF undercover vehicle to the agreed-upon location.  From review of the video footage from the ATF undercover vehicle, investigators could see that BAEZ SANCHEZ was standing outside next to an unknown vehicle when the CIs arrived.  The aforementioned silver Audi registered to TEJADA LARA appeared to be parked directly in front of the unknown vehicle next to which BAEZ SANCHEZ was standing.

31.     CI-2 exited the ATF undercover vehicle and got into the rear passenger seat.  BAEZ SANCHEZ walked to the driver's side of the unknown vehicle and then to the silver Audi.  BAEZ SANCHEZ then appeared to walk around the side of one of the semi-truck trailers out of the camera's view and returned with a plastic bag containing a large box.  BAEZ SANCHEZ was standing, opened the box, and removed what appeared to be a plastic bag and handed it to CI-2.  CI-2 then took one pistol out of the bag and examined it.

32.     BAEZ SANCHEZ then pulled a ball of tissue paper out of the box and opened it to show another pistol.  BAEZ SANCHEZ handed the second pistol to CI-2 and CI-2 examined it, wrapped it back up and put it in the plastic bag with the other pistol.

33.     BAEZ SANCHEZ then removed what appeared to be a dietary supplement container from the box and opened it to show it contained a powdery substance.  BAEZ SANCHEZ then closed the container and put it back in the box.

34.     The CIs paid BAEZ SANCHEZ for the fentanyl and firearms.

35.     BAEZ SANCHEZ exited the ATF undercover vehicle and CI-2 returned to the front passenger seat of the ATF undercover vehicle.

36.    The CIs met with investigators and provided investigators with the suspected fentanyl, a Smith & Wesson M&P Shield 9mm pistol with one magazine, and a Sig Sauer Mosquito .22 caliber pistol with one magazine.

37.    The CIs told investigators that BAEZ SANCHEZ told them he did not bring the third gun because it had been used in a couple homicides.

38.    Based on my training and experience, the substance in the dietary supplement container appears to be fentanyl.  The substance has been sent to the CBP Laboratory for testing and investigators are awaiting results.

**January 27, 2025 Controlled Purchase of Fentanyl and Two Pistols**

39.    Between January 19, 2025 and January 27, 2025, BAEZ SANCHEZ communicated with the CIs regarding the purchase of additional firearms and fentanyl.  BAEZ SANCHEZ directed the CIs to meet in Methuen, Massachusetts to conduct the transaction.

40.    On January 27, 2025, investigators set up surveillance at the agreed-upon meeting location in Methuen.  CIs arrived at the agreed-upon meeting location.  From review of the video footage from the ATF undercover vehicle, investigators could see that a white Honda Civic drove up from behind the ATF undercover vehicle about one minute after the ATF undercover vehicle arrived.  The white Honda Civic was registered to SANCHEZ PAREDES.  A gray Audi sedan parked perpendicular to the ATF undercover vehicle and next to a white box truck.  Investigators had seen BAEZ SANCHEZ operate the gray Audi sedan multiple times prior to this January 27, 2025 transaction.

41.    BAEZ SANCHEZ walked towards the back of the white box truck and removed what looked like a dark colored suitcase.  BAEZ SANCHEZ then walked to the ATF undercover

vehicle with the suitcase and removed what appeared to be a dietary supplement container. BAEZ SANCHEZ handed this container to CI-1.

42.    BAEZ SANCHEZ then placed the suitcase on the front seat center divider facing the backseat where CI-2 was sitting. CI-2 removed a pistol with a gold barrel and extended magazine from the suitcase, examined it, and then put it back in the suitcase. CI-2 then removed a second pistol, examined it, and returned it to the suitcase. CI-2 asked for a discount on the pistols and BAEZ SANCHEZ gave $100 back to CI-2.

43.    The CIs then asked BAEZ SANCHEZ for bullets for the guns. BAEZ SANCHEZ exited the ATF undercover vehicle. While investigators were unable to see where BAEZ SANCHEZ went upon exiting the vehicle, the CIs later told investigators that BAEZ SANCHEZ walked to a black Toyota Camry to get bullets for the pistols. BAEZ SANCHEZ returned to the ATF undercover vehicle provided the requested bullets and then quickly exited.

44.    The CIs met with investigators and provided investigators with the suspected fentanyl, a Ruger American Duty 9 mm pistol (bearing serial number 860-25606) with one magazine, a privately made 9mm firearm, and the assorted 9mm ammunition given to them by BAEZ SANCHEZ. CIs also told investigators that they spoke briefly with BAEZ SANCHEZ about purchasing AR-style rifles. BAEZ SANCHEZ said he could get guns like that and added that he could also get hollow point bullets. The CIs also asked about getting the phone number of BAEZ SANCHEZ's gun source, so CI-2 could contact that person directly to purchase guns. The video captured from the ATF undercover vehicle is consistent with the CIs' description of the transaction.

45.    The CBP Laboratory determined that the substance was approximately 159.71 grams of a substance containing fentanyl.

**February 10, 2025 Controlled Purchase of Two Firearms**

46.     Between February 7, 2025 and February 10, 2025, BAEZ SANCHEZ communicated with the CIs regarding the purchase of two firearms.  BAEZ SANCHEZ directed the CIs to meet in Methuen, Massachusetts to conduct the transaction.

47.     On February 10, 2025, investigators set up surveillance at the agreed-upon meeting location in Methuen.  The CIs drove the ATF undercover vehicle to the meeting location.  From review of the video footage from the ATF undercover vehicle, investigators could see that BAEZ SANCHEZ approached the ATF undercover vehicle carrying a plastic bag containing a large rectangular box.  BAEZ SANCHEZ opened the box revealing a brown paper bag that BAEZ SANCHEZ then handed to CI-2.  CI-2 removed a black plastic case, which contained two firearms. CI-2 examined the firearms and then handed cash to BAEZ SANCHEZ.  BAEZ SANCHEZ then exited the ATF undercover vehicle about seven minutes after entering the car.

48.     The CIs met with investigators and provided investigators with the Smith & Wesson Model SD9VE 9mm pistol (bearing serial number FWH4116) and the Glock Model 22 Gen4 40 caliber pistol (bearing serial number WDT595) given to them by BAEZ SANCHEZ.  CIs told investigators that they recognized TEJADA LARA at the transaction and that TEJADA LARA handed BAEZ SANCHEZ the bag that BAEZ SANCHEZ brought into the ATF undercover vehicle which contained the firearms.

49.     CIs also told investigators that they asked BAEZ SANCHEZ again about getting the phone number of the person who supplies the guns.  BAEZ SANCHEZ said he could get guns from his cousin who is in high school.

12

**May 23, 2025 Controlled Purchase of Fentanyl and Two Rifles**

50.    Between May 12, 2025 and May 22, 2025, BAEZ SANCHEZ communicated with the CIs regarding the purchase of firearms and fentanyl.

51.    On May 23, 2025, BAEZ SANCHEZ contacted the CIs and directed the CIs to meet at in Methuen to exchange cash for firearms and fentanyl.  BAEZ SANCHEZ contacted the CIs again before the transaction and told the CIs that the handgun would not be available, so the transaction would be for two rifles and fentanyl.

52.    The CIs drove the ATF undercover vehicle to the agreed-upon location.  From review of the video footage, BAEZ SANCHEZ approached the ATF undercover vehicle about 13 minutes after the CIs arrived.  BAEZ SANCHEZ instructed the CIs to move the ATF undercover vehicle next to one of the box trucks.  BAEZ SANCHEZ then instructed CI-2 to retrieve a bag from a Blue Honda sedan.  The bag contained two rifles, ammunition, a rifle scope, and a pair of bi-pod legs.

53.    While CI-2 retrieved the bag with the rifles and other materials, BAEZ SANCHEZ retrieved a box that contained the suspected fentanyl.

54.    The CIs discussed the condition of the rifles and BAEZ SANCHEZ agreed to reduce the price based on the poor condition of the rifles.  The CIs gave BAEZ SANCHEZ the money for the drugs and firearms and BAEZ SANCHEZ exited the ATF undercover vehicle.

55.    The CIs met with investigators and provided investigators with the materials they received from BAEZ SANCHEZ, including a Colt Car A3 HBAR Elite 223 caliber rifle bearing serial number BK009190 with three magazines, the ROMARM/CUGIR WASR-10 762 caliber rifle bearing serial number 1-78437-07 with four magazines, the suspected fentanyl, approximately

80 rounds of 223 ammunition, a PINTY Rifle Scope Red Dot Laser Combo, and a pair of bi-pod legs.

56.    The CIs also told investigators that they asked BAEZ SANCHEZ about getting the contact number for his gun supplier directly again.  BAEZ SANCHEZ said he would text it to the CIs at a later time.  On May 26, 2025, BAEZ SANCHEZ texted CI-1 a phone number as the firearm contact.

57.    The CBP Laboratory determined that the substance was approximately 104.04 grams of a substance containing fentanyl.

**November 26, 2025 Controlled Purchase of Fentanyl**

58.    On November 26, 2025, BAEZ SANCHEZ communicated with CI-1 regarding the purchase of fentanyl.  BAEZ SANCHEZ directed CI-1 to meet in Haverhill to conduct the transaction. BAEZ SANCHEZ told CI-1 that "Wilfry," whom BAEZ SANCHEZ described as his "brother" would complete the transaction.

59.    On November 26, 2025, investigators set up surveillance at the meeting location. About 20 minutes before CI-1 arrived, investigators observed the silver Audi A4 registered to TEJADA LARA depart the area of the agreed-upon meeting location.  About 15 minutes later, investigators observed TEJADA LARA's silver Audi A4 return and park.

60.    CI-1 arrived at the agreed-upon meeting location about two minutes after TEJADA LARA's silver Audi A4 returned.  About five minutes after arriving, CI-1 repositioned the vehicle

14

in front of a white Honda Civic. An individual later identified as SANCHEZ PAREDES[1] exited the white Honda Civic, carrying a grocery bag, and went into the ATF undercover vehicle with CI-1. Inside the ATF undercover vehicle, SANCHEZ PAREDES removed a creatine container containing suspected fentanyl, removed the cap to the container, and showed the contents to CI-1. CI-1 then handed the ATF agent cashier funds to SANCHEZ PAREDES. SANCHEZ PAREDES spoke to CI-1 for about two minutes and then exited the ATF undercover vehicle and returned to the white Honda Civic.

61.     As reflected in the video footage reviewed by investigators, during the controlled purchase, SANCHEZ PAREDES told CI-1 that he was nervous to conduct this transaction himself because one of his associates was recently arrested. SANCHEZ PAREDES also stated that he suspected he saw law enforcement during a prior attempted drug transaction. SANCHEZ PAREDES also told CI-1 that he was anticipating receiving a shipment of guns from the Carolinas and that he could get CI-1 whatever CI-1 wanted. SANCHEZ PAREDES added that he would be handling all of the transactions moving forward.

62.     CI-1 met with investigators and provided investigators with the suspected fentanyl. The CBP Laboratory determined that the substance was approximately 210.54 grams of a substance containing fentanyl.

63.     CI-1 told investigators that he observed BAEZ SANCHEZ driving in the area of the meeting location during the transaction driving TEJADA LARA's silver Audi A4. CI-1 also

---

[1] The white Honda Civic was registered to SANCHEZ PAREDES. Investigators obtained photographs of SANCHEZ PAREDES from his driver's license on file with the Massachusetts RMV and concluded that it appeared to be the same person involved in this controlled purchase.

told investigators that he saw TEJADA LARA driving in the area of the meeting location during the transaction driving a Blue Honda Accord. Based on my training and experience, I believe BAEZ SANCHEZ and TEJADA LARA were conducting counter surveillance to determine if any law enforcement was observing this controlled purchase.

**December 3, 2025 Controlled Purchase of Two Firearms**

64.    Between November 30, 2025 and December 3, 2025, BAEZ SANCHEZ and SANCHEZ PAREDES communicated with CI-1 to set up a purchase of two firearms: a Glock 43x 9mm pistol and a Lorcin 380 caliber pistol. BAEZ SANCHEZ told CI-1 that two other individuals would be present during this transaction and that other associates would be conducting counter-surveillance to identify any law enforcement in the area.

65.    On December 3, 2025, BAEZ SANCHEZ instructed CI-1 to meet in Haverhill. Investigators set up surveillance at the agreed-upon meeting location, including aerial surveillance.

66.    Shortly after CI-1's arrival, two males exited a white BMW parked nearby, walked to the ATF undercover vehicle, and then entered the ATF undercover vehicle. One of these males was later identified as PENA.[2] As these males were walking to the ATF undercover vehicle, the white BMW drove closer to the ATF undercover vehicle. At the same time, investigators saw BAEZ SANCHEZ walk from a blue Acura RDX parked nearby, carry a plastic grocery bag, and enter the rear passenger side door of the ATF undercover vehicle.

---

[2] CI-1 knew PENA. Additionally, local law enforcement is familiar with PENA and affirmed his identity from review of the controlled purchase. Investigators also obtained photographs of PENA from his driver's license on file with the Massachusetts RMV and concluded that it appeared to be the same person involved in this controlled purchase.

67.     As captured on the video recording inside the ATF undercover vehicle, the unknown male who walked from the white BMW, removed a Lorcin 380 caliber pistol from his sweatshirt pocket and handed it to CI-1.  A few moments later, BAEZ SANCHEZ removed a Glock 43x 9mm pistol bearing serial number BZDR473 loaded with 10 rounds of 9mm ammunition from a container inside the grocery bag he was carrying.  The unknown male then emptied a magazine containing five rounds of .380 ammunition into a container and then handed the magazine to CI-1.  The unknown male then handed the container with the ammunition to BAEZ SANCHEZ.  BAEZ SANCHEZ briefly looked at the container and handed it back to the unknown male.  The unknown male then closed the lid on the container and began wiping it with a purple towel.

68.     CI-1 then handed a portion of the money to BAEZ SANCHEZ.  BAEZ SANCHEZ counted the money and put it in his pocket.  CI-1 then handed BAEZ SANCHEZ additional money.  BAEZ SANCHEZ handed this money to the unknown male.  Then all three individuals exited the ATF undercover vehicle.

69.     BAEZ SANCHEZ returned to the blue Acura RDX.  PENA and the unknown male returned to the parked white BMW.

70.     CI-1 met with investigators and provided investigators with the firearms and ammunition.

**December 16, 2025 Controlled Purchase of Two Firearms**

71.     Between December 13, 2025 and December 16, 2025, BAEZ SANCHEZ communicated with CI-1 to set up a purchase of two firearms: a Glock 43GEN5 9mm pistol and a Ruger SR9 9mm pistol.  BAEZ SANCHEZ told CI-1 he would bring two other individuals to conduct this transaction.

72.    BAEZ SANCHEZ instructed CI-1 to meet in Lawrence, Massachusetts. Investigators set up surveillance at the agreed-upon meeting location, including aerial surveillance.

73.    CI-1 arrived at the agreed-upon meeting location and parked.  BAEZ SANCHEZ told CI-1 to move the ATF undercover vehicle up a little bit.  A white BMW, registered to ▮▮▮▮▮▮ then parked a few spots behind the ATF undercover vehicle and two males exited. These males were later identified as ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[3] ▮▮▮▮▮ and ▮▮▮▮▮▮ approached the ATF undercover vehicle and entered the rear of the vehicle.

74.    As captured in the video recording, ▮▮▮▮▮ and ▮▮▮▮▮▮ each removed a pistol from their respective sweatshirts, removed the magazines from the respective pistols, and removed the ammunition from the magazines before handing the magazines to CI-1.  CI-1 paid money to ▮▮▮▮▮ and ▮▮▮▮▮▮.  ▮▮▮▮▮ counted the money and then handed it to ▮▮▮▮▮.  ▮▮▮▮▮▮ counted the money and then put it in his pocket.

75.    BAEZ SANCHEZ then approached the ATF undercover vehicle and entered the front passenger seat.  CI-1 started discussing the price of the two firearms with ▮▮▮▮▮ and ▮▮▮▮▮▮, but then BAEZ SANCHEZ told CI-1 that CI-1 could only negotiate prices with BAEZ SANCHEZ.  BAEZ SANCHEZ requested additional money for arranging the transaction.

---

[3] CI-1 knew ▮▮▮▮▮.  Additionally, local law enforcement is familiar with both ▮▮▮▮▮ and ▮▮▮▮▮▮ and affirmed their identities from review of the controlled purchase. Investigators also obtained photographs of ▮▮▮▮▮ and ▮▮▮▮▮▮ from their driver's licenses on file with the Massachusetts RMV and concluded that they appeared to be the same people involved in this controlled purchase.

CI-1 then handed more money to ████████. ████████ handed the money to ████████ to count.

76.    ████████ and ████████ exited the ATF undercover vehicle.   BAEZ SANCHEZ remained in the ATF undercover vehicle and told CI-1 to be careful with ████████ and ████████ because they were recently involved in a shooting in Lawrence involving the Trinitario gang.  BAEZ SANCHEZ also discussed setting up a future transaction for narcotics and firearms.  CI-1 handed additional money to BAEZ SANCHEZ and then BAEZ SANCHEZ exited the ATF undercover vehicle.

77.    CI-1 met with investigators and provided them the Glock 43GEN5 9mm pistol with serial number BGCR274 and the Ruger SR9 9mm pistol with serial number 338-04430.

**January 22, 2026 Controlled Purchase of Two Firearms**

78.    Between January 10, 2026 and January 21, 2026, BAEZ SANCHEZ and SANCHEZ PAREDES communicated with CI-1 to set up a purchase of firearms.  As discussed below, two firearms were ultimately involved in this transaction: a Girsan Regard MC 9mm pistol bearing serial number T6368-21A03247 and a FEG PA63 9 mm pistol bearing serial number BF31487.   BAEZ SANCHEZ told CI-1 that SANCHEZ PAREDES would conduct this transaction.  BAEZ SANCHEZ instructed CI-1 to meet in Haverhill.

79.    About three minutes before CI-1 arrived at the agreed-upon meeting location, investigators observed two males exit enter a black Ford Escape registered to SANCHEZ PAREDES.  The black Ford Escape arrived in the area of the agreed-upon meeting location shortly thereafter.   SANCHEZ PAREDES exited the vehicle holding a plastic grocery bag and then entered the front passenger side of the ATF undercover vehicle.

80.    Inside the ATF undercover vehicle, SANCHEZ PAREDES told CI-1 that he only had two firearms to sell to CI-1 inside the grocery bag.  SANCHEZ PAREDES stated that PENA had the other two firearms and that he could sell them to CI-1 later in the day when PENA came up from Boston.

81.    As seen from the video captured in the ATF undercover vehicle, SANCHEZ PAREDES removed the FEG PA63 9 mm pistol from the bag and showed it to CI-1.  SANCHEZ PAREDES then placed the firearm back into the bag and removed the Girsan Regard MC 9mm pistol from the bag and showed it to CI-1.  SANCHEZ PAREDES handed the Girsan Regard MC 9mm pistol to CI-1.  CI-1 inspected the firearm and then placed it in the middle console. SANCHEZ PAREDES then removed the FEG PA63 9 mm pistol from the bag and placed it in the middle console.  CI-1 and SANCHEZ PAREDES then discussed the price for the firearms, and upon reaching agreement, CI-1 handed this amount of cash to SANCHEZ PAREDES.  SANCHEZ PAREDES counted the money and placed it into his pocket.

82.    SANCHEZ PAREDES also stated that he would have more firearms available the next week.  CI-1 asked if he could communicate with PENA directly.  SANCHEZ PAREDES replied that BAEZ SANCHEZ had been too nervous lately.  CI-1 asked SANCHEZ PAREDES to get PENA's number for him and not to say anything to BAEZ SANCHEZ.  Shortly thereafter, SANCHEZ PAREDES exited the ATF undercover vehicle.

83.    As CI-1 drove away from the area, CI-1 drove past SANCHEZ PAREDES's black Ford Escape.  BAEZ SANCHEZ was in SANCHEZ PAREDES's black Ford Escape.  CI-1 stopped for a moment to speak with BAEZ SANCHEZ.

84.    CI-1 then met with investigators and provided investigators with the firearms.

20

**February 20, 2026 Controlled Purchase of Two Firearms**

85.     Between February 17, 2026 and February 20, 2026, BAEZ SANCHEZ communicated with CI-1 to set up a purchase of two firearms: a privately made firearm ("PMF") 9mm with no serial number and an SCCY Industries CPX-2 pistol bearing serial number C181886. BAEZ SANCHEZ told CI-1 that PENA would conduct this transaction.  BAEZ SANCHEZ instructed CI-1 to meet in Lawrence, Massachusetts.  Investigators set up surveillance in the area of the agreed-upon meeting location, including aerial surveillance.

86.     As related by CI-1 and consistent with video footage and surveillance, CI-1 arrived at the agreed-upon meting location and parked.  CI-1 called BAEZ SANCHEZ twice.  The first call was unanswered.  On the second call, CI-1 told BAEZ SANCHEZ that CI-1 was at the agreed-upon meeting location and asked where PENA was.  BAEZ SANCHEZ told CI-1 to go to another location.  CI-1 refused and told BAEZ SANCHEZ to come to the agreed-upon meeting location. BAEZ SANCHEZ agreed.

87.     Shortly after the telephone call between CI-1 and BAEZ SANCHEZ, PENA exited a nearby residence and entered the ATF undercover vehicle.  PENA told CI-1 that another individual could obtain firearms for a future exchange.  PENA then provided CI-1 with his phone number.

88.     BAEZ SANCHEZ and ▆▆▆▆▆ arrived shortly thereafter and parked behind the ATF undercover vehicle.  BAEZ SANCHEZ and ▆▆▆▆▆ approached the ATF undercover vehicle and entered.  As captured by video inside the ATF undercover vehicle, ▆▆▆▆▆ handed the firearms to CI-1.  One of the firearms was equipped with a 50 round drum magazine.  Upon handing the firearm with the 50 round drum magazine to CI-1, ▆▆▆▆▆ stated look what I got for you.  The parties then discussed future firearm transactions.

89.     CI-1 then handed money to BAEZ SANCHEZ for the firearms.  BAEZ SANCHEZ, ███████, and PENA asked for additional money.  CI-1 agreed and handed them the additional money.  BAEZ SANCHEZ, ███████, and PENA then exited the ATF undercover vehicle.

90.     CI-1 then met with investigators and provided them with the firearms.

**March 4, 2026 Controlled Purchase of One Firearm**

91.     Between March 2, 2026 and March 4, 2026, PENA communicated with CI-1 to set up a purchase of firearms.  As discussed below, only one firearm was ultimately involved in this transaction: a Taurus Gx4 9mm pistol bearing serial number 1GC61472.  PENA instructed CI-1 to meet in Lawrence, Massachusetts.

92.     CI-1 arrived at the agreed-upon meeting location and parked.  A black Honda CR-V parked behind the ATF undercover vehicle shortly after CI-1 arrived.  PENA exited the front passenger seat of the Honda CR-V and a male later identified as MARTINEZ exited the driver's seat.[4]  PENA and MARTINEZ then entered the ATF undercover vehicle.

93.     As captured by video inside the ATF undercover vehicle, PENA told CI-1 that he did not have any firearms with him and he was having one of his associates get the firearms from a storage unit in between Haverhill and Methuen.  CI-1 asked if PENA had a gun on him that he was willing to sell.  PENA exited the ATF undercover vehicle, walked into a nearby residence, and then returned to the ATF undercover vehicle less than two minutes later.  When back inside

---

[4] Local law enforcement is familiar with MARTINEZ and affirmed his identity from review of the controlled purchase.  Investigators also obtained photographs of MARTINEZ from his driver's license on file with the Massachusetts RMV and concluded that it appeared to be the same person involved in this controlled purchase.  Investigators reviewed court records and found records consistent with MARTINEZ's statements about coming from court that morning.

the ATF undercover vehicle, PENA removed the Taurus GX4 9mm pistol, loaded with nine rounds of ammunition, from his pants and negotiated the price for it.

94.    PENA and MARTINEZ spoke with CI-1 for another 12 minutes.  During this time, PENA told CI-1 that MARTINEZ was the person with the supply of guns and that MARTINEZ got the guns from Maine.  MARTINEZ commented that he had come from court earlier that day and is on probation for one year.  Investigators confirmed that MARTINEZ had been present in Lawrence District Court earlier that day and was on probation.  CI-1 and PENA agreed that PENA's unknown associate who was reportedly getting the other firearms from the storage unit was taking too long, so they agreed to conduct another transaction the following week. MARTINEZ gave CI-1 his phone number.  Shortly thereafter, PENA and MARTINEZ exited the ATF undercover vehicle.

95.    CI-1 then met with investigators and provided them with the firearm and ammunition.

**March 11, 2026 Controlled Purchase of Three Firearms**

96.    Between March 9, 2026 and March 11, 2026, PENA communicated with CI-1 to set up a purchase of three firearms: a Glock Model 20 10mm pistol bearing serial number BNNP622; a Glock Model 26 9mm pistol bearing serial number AKBC007 with six rounds of 9mm ammunition; and a privately made firearm ("PMF") 9mm pistol.  PENA instructed CI-1 to meet in Methuen, Massachusetts.

97.    CI-1 arrived and parked outside the agreed-upon meeting location and called PENA.  Shortly thereafter, PENA exited the residence at the agreed-upon location and entered the front passenger seat.  PENA instructed CI-1 to back the ATF undercover vehicle into the driveway

of the residence.  Shortly after backing into the driveway, MARTINEZ exited the residence holding a plastic bag.  MARTINEZ entered the rear passenger seat of the ATF undercover vehicle.

98.    As captured on video inside the ATF undercover vehicle, MARTINEZ handed CI-1 the three firearms.  One of the firearms was loaded with six rounds of ammunition.  CI-1 inspected the firearms and negotiated a price with PENA.  Upon reaching an agreement on the price, CI-1 handed the money to PENA.  PENA counted the money, shook CI-1's hand, and then placed the money in his sweatshirt pocket.  PENA and MARTINEZ spoke with CI-1 for a few more minutes.  During this conversation, PENA stated that he would be able to get more guns by Friday and that PENA wanted to sell five or six more firearms, including a fully automatic firearm.  CI-1 told PENA to bring ███████ to the next transaction because the guns ███████ sold to CI-1 did not function.[5]  PENA told CI-1 that he would send CI-1 pictures of the fully automatic firearm within the next couple days.  PENA and MARTINEZ then exited the ATF undercover vehicle.

99.    CI-1 then met with investigators and provided them with the firearms and ammunition.

---

[5] Investigators reviewed the firearms and confirmed they contain all components of a firearm.  The firearms will be sent for forensic examination to determine why they would not fire.

100.     Investigators queried the firearms in the National Crime Information Center ("NCIC") database[6] and the Glock Model 20 10mm pistol bearing serial number BNNP622 and Glock Model 26 9mm pistol bearing serial number AKBC007 have been reported stolen.

**March 19, 2026, Controlled Purchase of Fentanyl and Two Firearms**

101.     Between March 16, 2026 and March 19, 2026, PENA communicated with CI-1 to set up a purchase of fentanyl and two firearms: a Remmington Arms Company 870 Express Super Mg 12-gauge shotgun bearing serial number B238015M; and a Walther Sp22 pistol bearing serial number L310716.  PENA instructed CI-1 to meet in Lawrence, Massachusetts.

102.     CI-1 arrived at the agreed-upon meeting location, parked, and called PENA. Shortly thereafter, a white Toyota Rav4 parked behind the ATF undercover vehicle.  PENA exited the front passenger door and retrieved a long object wrapped in fleece from the rear of the white Toyota.  PENA brought this item to the ATF undercover vehicle and placed it in the backseat. Then PENA entered the ATF undercover vehicle.

103.     As captured on video inside the ATF undercover vehicle, PENA told CI-1 that his "boy" observed someone parked down the street and asked CI-1 if CI-1 was with someone.  CI-1 said no and asked if PENA was with someone.  PENA replied yes, but that person did not want to be seen.  PENA took the pistol from his sweatshirt pocket and placed it on top of the middle console area.  PENA then retrieved a small bag of fentanyl and placed it next to the pistol.

---

[6] The NCIC database is operated by the Federal Bureau of Investigation and is accessible by U.S. law enforcement.  It tracks crime-related information, including as relevant here, information about stolen guns.

104.  PENA and CI-1 then discussed the price for the firearms and fentanyl.  Upon reaching an agreement on price, CI-1 handed PENA the agreed-upon amount.  PENA counted the money and placed it in his sweatshirt pocket.  PENA then exited the ATF undercover vehicle, returned to the white Toyota, and then the white Toyota drove away from the area.

105.  CI-1 then met with investigators and provided them with the firearms and the suspected fentanyl.

106.  The suspected fentanyl has been sent to the CBP Laboratory for testing and investigators are awaiting results.

**Subsequent Communications Regarding Additional Firearms Trafficking**

107.  On April 2, 2026, PENA communicated with CI-1 via text message using the same number PENA provided to CI-1.  In those text messages, PENA discussed selling firearms to CI-1.  In those messages, PENA sent the images below to CI-1:



108.  Similarly, on April 2 and 3, 2026, TEJADA LARA communicated with CI-1 via text message using the same number TEJADA LARA provided to CI-1.  In those text messages, TEJADA LARA discussed selling firearms to CI-1.  TEJADA LARA asked for a price of $1,450 for two pistols.  In those messages, TEJADA LARA sent the images below to CI-1:



**May 4, 2026, Controlled Purchase of Fentanyl and Two Firearms**

109.    Between April 29, 2026 and May 2, 2026, TEJADA LARA and BAEZ SANCHEZ communicated with CI-1 to set up a purchase of fentanyl and two firearms: a privately made firearm ("PMF") 9mm pistol with no serial number and a Smith & Wesson Bodyguard .380 caliber pistol, bearing serial number ECE7552.  BAEZ SANCHEZ told CI-1 that "his brother" TEJADA LARA would conduct the exchange.  BAEZ SANCHEZ instructed CI-1 to meet in Haverhill.

110.    A few minutes before CI-1 arrived at the agreed-upon meeting location, investigators observed TEJADA LARA's silver Audi A4 park in front of a nearby residence.  One male exited the vehicle and entered the residence.  A few moments later, two males exited the residence and entered TEJADA LARA's silver Audi A4.  One of the males was carrying a bag. Investigators then saw TEJADA LARA's silver Audi A4 drive to the agreed-upon meeting location.

111.    Upon arriving at the agreed-upon meeting location, TEJADA LARA exited the silver Audi A4 and entered the back passenger seat of the ATF undercover vehicle.  SANCHEZ PAREDES also exited the silver Audi A4 and entered front passenger seat of the ATF undercover vehicle.

112.    As captured on video inside the ATF undercover vehicle, TEJADA LARA and SANCHEZ PAREDES handed CI-1 two firearms and a plastic bag inside a plastic container that

contained suspected fentanyl. CI-1 handed TEJADA LARA and SANCHEZ PAREDES cash in exchange for these items. TEJADA LARA and SANCHEZ PAREDES discussed engaging in potential future transactions with CI-1 for firearms and narcotics. TEJADA LARA and SANCHEZ PAREDES exited the ATF undercover vehicle and returned to TEJADA LARA's silver Audi A4.

113. CI-1 then met with investigators and provided them with the firearms and suspected fentanyl. The suspected fentanyl has been sent to the CBP Laboratory for testing.

## RELEVANT BACKGROUND OF THE TARGET SUBJECTS

114. Investigators searched the ATF database to determine whether any of the Target Subjects were licensed federal firearms dealers ("FFLs"). The records show that none of the Target Subjects are FFLs.

115. Investigators also searched whether any of the Target Subjects had a license to carry firearms in Massachusetts or a firearm identification card. The records show that none of the Target Subjects had a license to carry firearms in Massachusetts or a firearm identification card.

116. Investigators also ran criminal history reports for each of the Target Subjects.

117. BAEZ SANCHEZ was found guilty of possession to distribute a class B substance (cocaine), which is a felony punishable by more than one year in prison, in Lawrence District Court (Docket No. 1718CR001489) on June 2, 2017.

## INTERSTATE COMMERCE

118. Based on my training and experience, and communications with other agents experienced in the area of firearm tracing, I know that only Smith & Wesson manufactures or manufactured firearms in the Commonwealth of Massachusetts. Further, commercially manufactured ammunition is not manufactured in the Commonwealth of Massachusetts.

28

Accordingly, any non-Smith and Wesson firearms, and, any commercially manufactured ammunition necessarily traveled in interstate or foreign commerce.

## **CONCLUSION**

119.  Based on the information set forth above, there is probable cause to believe that

a.  Beginning in or about February 2025 and continuing to in or about May 2026, BAEZ SANCHEZ, TEJADA LARA, and SANCHEZ PAREDES conspired to distribute and to possess with intent to distribute in excess of 40 grams of fentanyl, in violation of 21 U.S.C. §§ 841(a) and (b)(1)(B)(vi) and 846 ;

b.  Beginning in or about February 2025 and continuing to in or about May 2026, BAEZ SANCHEZ, TEJADA LARA, SANCHEZ PAREDES, PENA, and ▮▮▮▮▮ conspired to engage in the business of dealing firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A); and

c.  Beginning in or about March 2, 2026 and continuing to at least March 11, 2026, PENA and MARTINEZ conspired to engage in the business of dealing firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A).

Respectfully submitted,

_Jeremy D. Brisson /by Paul G. Levenson_
Jeremy D. Brisson
Special Agent, ATF

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

HON. PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE

Dated: May 13, 2026

29